**CASE NO. 26-1603**

**IN THE**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

Forma AI, Inc.
*Plaintiff-Appellant*,

v.

Twic, Inc.
*Defendant-Appellee*.

On Appeal from the United States District Court
for the Eastern District of North Carolina, Eastern Division
No. 4:23-CV-77-BO-BM, Honorable Terence W. Boyle

# RESPONSE BRIEF OF APPELLEE

SUBMITTED BY:
Emily M. Haas
Michael Best & Friedrich LLP
4509 Creedmoor Rd, Ste 501
Raleigh, NC 27612
(984) 220-8745
emhaas@michaelbest.com

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

JURISDICTIONAL STATEMENT ........ 1

STATEMENT OF ISSUES ........ 2

STATEMENT OF CASE ........ 3

SUMMARY OF ARGUMENT ........ 19

ARGUMENT ........ 21

I. The Court Should Affirm the District Court's Entry of Summary Judgment Because AIA Failed to Adduce Sufficient Evidence of Likelihood of Confusion ........ 21

A. FAI's Asserted Instances of Actual Confusion Are *De Minimis* even if Credited ........ 22

B. FAI's "Actual Confusion" Evidence Is Speculative ........ 27

C. The Relevant Market for Purposes of this Appeal is "HR Tech" ........ 28

D. FAI's FORMA.AI Mark Is Weak ........ 30

E. The Only Similarity Is the Word "forma" ........ 42

F. The District Court Held Correctly that the Similarity of the Facilities Used Factor is Neutral....48

G. Similarity of the Advertising Slightly Favors FAI....50

H. Twic Did Not Intend to Cause Consumer Confusion....51

I. The Quality of Twic's Product Factor Is Neutral....51

J. The Parties' Goods and Services Are Purchased by Sophisticated Consumers in Sophisticated Transactions....51

II. The District Court's Did Not Abuse Its Discretion by Reconsidering Its Prior Summary Judgment Ruling and Did Not Err by Dismissing FAI's State Law Claims....55

A. FAI's Asserted Instances of Actual Confusion Are *De Minimis* even if Credited....55

B. FAI's "Actual Confusion" Evidence Is Speculative....60

III. Conclusion....64

STATEMENT REGARDING ORAL ARGUMENT....64

## TABLE OF AUTHORITIES

**Cases** **Page**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
722 F.3d 1229 (10th Cir. 2013) ........................................................ 23

*Acad of Motion Picture Arts & Scis v. Creative House Promotions, Inc.*,
944 F.2d 1446 (9th Cir 1991) ........................................................ 62

*Ak Futures LLC v. TBH Supply LLC*,
2023 U.S. Dist. LEXIS 198108 (C.D. Cal. Nov. 3, 2023) ............................ 61

*Aktiebolaget Electrolux v. Amratron Int'l, Inc.*,
999 F.2d 1 (1st Cir. 1993) ........................................................ 22

*Am. Canoe Ass'n v. Murphy*,
326 F.3d 505 (4th Cir. 2003) ........................................................ 55, 56, 59

*Anheuser-Busch, Inc. v L&L Wings, Inc.*,
962 F.2d 316 (4th Cir. 1992) ........................................................ 42,44

*Belk, Inc. v. Meyer Corp.*,
679 F.3d 146 (4th Cir. 2012) ........................................................ 63

*CareFirst of Md., Inc. v. First Care, P.C.*,
434 F.3d 263 (4th Cir. 2006) ........................................................ 22, 27, 29, 31, 38, 40

*Care First of Md, Inc. v. FirstHealth of the Carolinas, Inc.*,
77 U.S.P.Q.1492 (T.T.A.B. 2005), *aff'd*, 479 F.3d 825 (Fed. Cir. 2007)........46

*Carlson v. Boston Sci. Corp.*,
856 F.3d 320 (4th Cir. 2017) ........................................................ 55

*CDOC, Inc. v. Liberty Bankers Life Ins. Co.*,
844 F. App'x. 357 (Fed. Cir. 2021) ........................................................ 51, 53

*Century 21 Real Estate Corp. v. Sandlin*,
846 F.2d 1175 (9th Cir. 1988) ................................................................ 62

*Cleary v. News Corp.*,
30 F.3d 1255 (9th Cir. 1994) .................................................................. 61

*Compound Development LLC v. Smith*,
2025 WL 818588 (Cal. Super. Ct. 2025) .................................................. 60

*Elec. Design & Sales, Inc. v. Elec. Data Sys. Corp.*,
954 F.2d 713 (Fed. Cir. 1992) .................................................................. 21

*Ficep Corp. v. Voortman USA Corp.*,
2015 U.S. Dist. LEXIS 37013 (D. Md. 2015) ............................................. 55

*Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*,
618 F.3d 441 (4th Cir. 2010) .................................................................... 61

*George & Co., LLC v. Imagination Entm't Ltd.*,
575 F.3d 383 (4th Cir. 2009) ............................................ 23, 25, 26, 40, 42, 51

*Grayson O Co. v. Agadir International, LLC*,
856 F.3d 307 (4th Cir. 2017) ................................................ 30, 31, 39, 42, 44

*IDV N. Am., Inc. v. S&M Brands, Inc.*,
26 F. Supp. 2d 815 (E.D. Va. 1998) ......................................................... 23

*In re Broadway Chicken, Inc.*,
38 U.S.P.Q.2d 1559 (T.T.A.B. 1996) ........................................................ 46

*Johnson & Morris, PLLC v. Abdelbaky & Boes*, PLLC,
2017 NCBC LEXIS 89 (Supr. Ct. Wake. County Sept. 28, 2017) ............. 61

*King Candy Co. v. Eunice King's Kitchen, Inc.*,
496 F.2d 1400 (C.C.P.A. 1974) .......................................................................46

*Lodestar Anstalt v. Bacardi & Co.*,
31 F.4th 1228 (9th Cir. 2002) .........................................................................62

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog LLC*,
507 F.3d 252 (4th Cir. 2007) .........................................................................48

*Mintz v. Subaru of Am., Inc.*,
716 F. App'x 618 (9th Cir. 2017) ..................................................................61

*Netscape Commc'n Corp. v. ValueClick, Inc.*,
704 F. Supp. 2d 544 (E.D. Va. 2010) ............................................................56

*New York Stock Exchange, Inc. v. New York, New York Hotel, LLC*,
293 F.3d 550 (2d Cir. 2002) ..........................................................................21

*Passport Health, LLC v. Avance Health Sys.*,
823 F. App'x. 141 (4th Cir. 2020) ................................................39, 40, 61, 63

*Perini Corp. v. Perini Constr., Inc.*,
915 F.2d 121 (4th Cir. 1990) .............................................................20, 21, 51

*Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*,
130 F.3d 88 (4th Cir. 1997) ...................................................................... 23, 31

*Pizzeria Uno Corp. v. Temple*,
747 F.2d 1522 (4th Cir. 1984) ...................................................21, 27, 29, 31, 41

*State Auto Prop. & Cas. Ins. Co. v. Campbell*,
2020 U.S. Dist. LEXIS 248311 (N.D.W. Va. July 14, 2020)..........................56

*Sunbeam Corp. v. Equity Indus., Corp.*,
635 F. Supp. 625 (E.D. Va. 1986), *aff'd* 811 F.2d 1505 (4th Cir. 1987)...... 22

*Swatch AG v. Beehive Wholesale LLC,*
739 F.3d 150 (4th Cir. 2014) ........................................................... 22, 48

*United States Conf. of Catholic Bishops v. Media Research Ctr.*,
432 F. Supp. 2d 616 (E.D. Va. 2006) ..........................................................48

**Statutes**

15 U.S.C. §1114..........................................................................................15, 21, 59

**Other Authorities**

J. Thomas McCarthy, *McCarthy on Trademarks*
§23:14, §25A:7, §32:189 ........................................................................23, 25, 44

Trademark Manual of Examining Procedure
§1207.01.........................................................................................................32

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1603 Caption: Forma AI, Inc. v. Twic, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Twic, Inc.
(name of party/amicus)

who is the appellee, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐ YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/Emily Haas Date: May 15, 2026

Counsel for: Twic, Inc.



Print to PDF for Filing

# INTRODUCTION

This appeal arises from a trademark dispute between Plaintiff-Appellant Forma AI, Inc. ("FAI") and Defendant-Appellee Twic, Inc. ("Twic"). FAI sells sales compensation software to large, multinational corporations under the FORMA.AI mark shown below:

Twic provides flexible employee benefits through its software platform, which is typically sold to companies through employee benefits brokers under the logo mark shown below:

FAI alleges that Twic's mark violated its trademark rights under the Lanham Act and state unfair competition laws. The district court, however, correctly entered summary judgment in Twic's favor because FAI failed to adduce sufficient evidence of likelihood of confusion. The Court should affirm that decision, as the district court correctly applied the requisite factors under this Court's *Pizzeria Uno* standard and concluded that no reasonable jury could find that the parties' marks created a likelihood of confusion.

The Court should also affirm the district court's subsequent dismissal of FAI's state law claims, which were undisputedly based on the same trademark theories as the Lanham Act claims and therefore failed for insufficient proof of likelihood of confusion.

## JURISDICTIONAL STATEMENT

Appellee agrees this Court has subject matter jurisdiction over this appeal.

## STATEMENT OF ISSUES

1. Whether the district court erred by entering summary judgment in favor of Defendant-Appellee Twic, Inc. ("Twic") on the Lanham Act claims of Plaintiff-Appellant Forma AI, Inc. ("FAI") where the undisputed material facts demonstrated no likelihood of confusion between the parties' trademarks.

2. Whether the district court erred by reconsidering its initial decision and entering summary judgment for Twic on FAI's state law claims, which were premised on the same trademark theories as the Lanham Act claims and required triable proof of likelihood of confusion.

## STATEMENT OF CASE

**Twic and Its FORMA Services**

Twic provides flexible employee benefits through its FORMA software platform. JA1282-1283; JA1725.[1] Flexible employee benefits programs are popular with companies seeking to provide benefits to their employees, as these programs provide personalization for the employee while easing the company's administrative burden and costs. JA1282-1283; JA1725. Twic's FORMA platform allows companies to offer (i) Lifestyle Savings Accounts ("LSA"s), which are employer-funded accounts which affords employees discretion to spend however they wish to support their lifestyle within certain benefit program guidelines; (ii) pre-tax accounts such as Health Savings Accounts ("HSA"s) and Flexible Spending Accounts ("FSA"s); and (iii) Health Reimbursement Accounts ("HRA"s), which are employer-funded accounts that employees may use to pay for

[1] The Eastern District of North Carolina, in its Local Rules, requires parties to file statements of facts with evidentiary citations and supporting appendices of the admissible evidence in support of motions for summary judgment. The opposing party must then respond to each paragraph with evidentiary citations to any opposing or conflicting evidence. Local Civil Rule 56.1(a). Statements of fact must be supported by evidentiary citations. Local Civil Rule 56.1(a)(3). Citations herein are primarily to these statements of facts.

health products or services that are not covered by the company's traditional health insurance plan. JA1282-1283; JA1725.

Twic's services are sold in the "Employee Benefits" market of the Human Resources (HR) space. JA504. The Employee Benefits market is one of three markets in the HR space. JA504. The Employee Benefits market encompasses everything in benefits: health insurance, prescription drug coverage, employee assistance and wellness programs, retirement benefits (e.g. 401(k), pension plans, financial planning services), time-off benefits (e.g. vacation leave, sick leave, family leave), and work-life balance benefits (e.g. hybrid work, flexible schedules, childcare support). JA1282-12836. The other markets in the HR space are (i) the "Operations" market, which is directed to helping HR departments with their primary operational functions, such as running payroll, maintaining a core HR information system, providing employee training, and onboarding new employees; and (ii) the "Compensation" market, which addresses main compensation, salary, and compensation equity concerns. JA504. The three markets are not directly competitive. JA504. Indeed, FAI's own expert recognized that employee benefits software and services are not directly competitive with sales compensation products and services. JA1283.

Employee benefits are typically sold to companies through employee benefits brokers. JA1283-1284; JA1728-JA1729. The company contracts with an employee benefits broker to provide recommendations about which benefits to offer and which providers to use. JA1283-1284; JA1728-JA1729. Between 70% to 90% of Twic's sales go through employee benefits brokers. JA1283-1284; JA1728-JA1729.

Regardless of whether a sale occurs through a broker or through another channel, sales of employee benefits products and services are substantial and time-consuming. JA1284-1285; JA1730-1731. Twic attends multiple meetings with a potential customer and prepares and presents customized materials to that customer over a period of months. JA1284-1285; JA1730-1731.

Because of the importance of employee benefits brokers in the sale of employee benefits products and services, Twic focuses the quantitative majority of its advertising and promotion resources to the channels used by those brokers. JA1285-1288; JA1731-1736. In particular, employee benefits brokers maintain web portals that are run by the broker community. JA1285-1288; JA1731-1736. Brokers use these portals to learn about different types of benefits and benefits providers, and to prepare recommendations

or pitches for the companies the broker serves. JA1285-1288; JA1731-1736. Benefits providers submit information to the portals to describe and promote the products and services that provider offers. JA1285-1288; JA1731-1736. Some portals further allow providers to upload videos or brochures about their products and services. JA1285-1288; JA1731-1736.

Twic also maintains a website through which it promotes its products and services. JA1288-1291; JA1736-JA1739. A user who accesses the website will typically find their eye immediately pulled to the largest font on the screen, which reads "flexible benefits that" and is followed by a rotating set of phrases describing Twic's benefits services. JA1288-1291; JA1736-JA1739. Beside this proclamation is a set of unique character illustrations representing happy employees using their benefits. JA1288-1291; JA1736-JA1739. The webpage includes Twic's FORMA logo in the upper left-hand corner of the website navigation bar. Similar layouts may be found on subpages for various products offered by Twic. JA1288-1291; JA1736-JA1739. For example, Twic's pre-tax products and services are promoted on a page with the large heading "Pre-tax Accounts," which is arranged beside another character illustration, while Twic's LSA products and services are promoted on a page with the large title "Lifestyle Spending

Accounts (LSAs)" beside a set of character illustrations. JA1288-1291; JA1736-JA1739. The FORMA logo is again contained on the upper left-hand corner of the navigation bar. JA1288-1291; JA1736-JA1739.

Twic utilizes the same brand appearance consistently across all facets of the company. JA1285-1298. Twic's brochures, mobile application, trade show booths, and even some social media posts incorporate Twic's unique brand - to include the FORMA logo, the emphasis on employee benefits services, and the character illustrations. JA1285-1298.

Originally, Twic used the name TWIC. JA1285-1299. In 2021, Twic decided to rebrand and hired Landscape, a brand development firm, to help Twic find a new name. JA1285-1299. Landscape presented Twic with dozens of options. JA1285-1299. From the options developed by Landscape, Twic selected FORMA, along with the logo mark shown below, also developed by Landscape:

JA1285-1299. In February 2022, Twic filed an application to register its FORMA logo with the U.S. Patent and Trademark Office ("USPTO"). JA1285-1299. In early March 2022, Twic officially rebranded to FORMA.

JA1285-1299. Twic updated its website, broker portal materials, social media pages, brochures, and trade show booths with the new brand. JA1285-1299.

**<u>FAI and Its FORMA.AI Services</u>**

FAI sells sales compensation software under the FORMA.AI mark shown below:

FORMA.AI

JA1299-1301; JA1752-JA1756. Primarily, FAI sells its products and services to large, multinational corporations. JA1301. These sales occur primarily through FAI's website. JA1303-1304. FAI only has twenty-three customers in the United States. JA1300-1301; JA1797. From 2016 through early 2024, FAI spent less than $5 million advertising its goods and services in the United States; approximately 1/3 of those costs were spent on paying employees as opposed to actual advertising. JA1302. FAI conceded it has not engaged in widespread use of FORMA.AI. JA1302-1303. These facts are not contested. JA1755-1756; JA1758-1763.

When FAI uses FORMA.AI to sell products and services, it is as part of a complex sales process. JA1304-1305. Potential customers attend immersion discussions with FAI to allow FAI to learn about the potential customer's organization and its goals. JA1304-1305. FAI conducts discovery and analyzes documents. JA1304-1305. After listening to the customer and conducting its research, FAI presents a Statement of Work to the potential customer, outlining how FAI can help the potential customer. JA1304-1305. Typically, the decision maker in purchasing FAI's products is a company's CEO, CHRO, or CFO. JA1304-1305. FAI did not contest these facts. JA1763.

**<u>Third Parties use FORMA in the "HR Tech" market</u>**

In this dispute, FAI contends the market for its and Twic's services is "HR Tech," which FAI defined expressly as "any technology that supports and enables the human resources within a business." JA1300; JA1754. There are many third parties who provide products and services in this market under names that include "forma." JA1312-1315; JA1784-1795.

FAI did not dispute the existence of webpages showing uses of SCIFORMA, DIGIFORMA, FORMA (by Forma Life Science Marketing), FORMA LEADERS, FLOWFORMA, "FORMA: AI PDF Editor & Creator,"

PERFORMA APPS, INFORMACAST, FORMA VISION, FORMA LMS, or FORMA (by Forma Consultants). JA1789-1795. These webpages promote products and services that can be used by HR departments, such as employee training services or technology for employee training; HR process automation; software for filling in forms (a common activity in HR departments and workflows); and videoconferencing software (which could be used by HR departments to conduct interviews or virtual trainings). JA1314-1315.

FAI conceded that there were at least 25 registrations or allowed applications at the USPTO for software marks that include the string f-o-r-m-a, and 10 registrations or allowed applications for business technology or consulting marks that include the string f-o-r-m-a. JA1312-1314; JA1784-1787. Of these, at least COFORMA, Reg. No. 6277107; DEALFORMA, Reg. No. 5626905; INFORMAI, Reg. No. 5772904; MYPERFORMA, Reg. No. 5681707; ONEFORMA, Reg. No. 6611137; PERFORMA, Reg. No. 7013364; PERFORMA ENTERPRISE, Reg. No. 5855797; PERFORMA LABS, Reg. No. 6577801; PROFORMA PROVISION, Reg. Nos. 6389830, 6389862, 6342218; SAAS PROFORMA, Reg. No. 6286048; SCIFORMA, Reg. No. 2862807; and

TRANSFORMAI, Reg. No. 5781496 include descriptions of the services that would cover the "HR Tech" market. JA668-JA699.

**Relevant Consumers Are Not Confused**

Both FAI's and Twic's services are purchased by sophisticated purchasers through complex processes. JA1730-1731; JA1763. FAI admitted that companies interested in Twic's services interact over multiple meetings and multiple months prior to purchasing Twic's services. JA1730-1731. FAI admitted that its typical sales process is also complex with multiple meetings over a period of time. JA1763. It is not contested that the individuals involved in deciding to purchase either FAI's and/or Twic's services are accomplished business executives. JA1730-1731; JA1763.

FAI and Twic used their respective FORMA marks over a two-and-a-half-year period. JA1798. FAI identified less than thirty possible instances of confusion during that time period. JA1306-1312. Most, if not all, are with individuals who were not involved in a decision to purchase either of the parties' products and services. JA1306-1312.

Approximately four of the occurrences FAI identified as "instances of confusion" are tags on social media.[2] JA1306-1311. FAI never spoke with any of the people who made these posts to determine if they were actually confused between the parties. JA1306-1311. Twic investigated one of these instances and learned that the tag was a mistag (caused by a software error) and the person who made the post was not confused. JA1308.

Three of the "instances of confusion" are voicemails. JA1310. FAI did not communicate with the individuals who left the voicemails. JA1310.[3]

Approximately twelve of FAI's "instances of confusion" involve emails from end users—employees of Twic's customers—seeking support regarding Twic's software. JA1307-1310. Five emails were from Rubrik employees and three were from Grammarly employees. JA1307-1310. After Twic changed its name and URL, Rubrik and Grammarly took existing materials with the support@twic.ai email address and changed all

---

[2] A "tag" is a link placed into a social media post when the post mentions the user of that platform. Popular social media platforms like LinkedIn and Facebook will attempt to autocomplete names and tag users of their platforms. This can lead to mistags. For example, a poster intends to refer to one person but the software autocompletes the name and tags another as both people have the same first name.

[3] One of the voicemails was disclosed after the close of discovery. JA1809. There is no evidence that FAI communicated with the individual who left it.

references to "twic" to "forma," resulting in those materials incorrectly identifying the support address for Twic as support@forma.ai (which is FAI's email). JA1307-1310. Another three emails from other end user employees were similarly directed to either support@forma.ai or info@forma.ai. JA1309-1310.

Three additional emails involved individuals interested in obtaining information about Twic's services accidentally speaking with FAI. JA321-JA327. None of these resulted in lost sales for FAI. There is no evidence that any of the individuals who sent these emails are decisionmakers for purchasing the type of services offered by either party. JA321-JA327. Although a fourth email mentioned Twic and FAI, it involved a company that reported it was not going to move forward with FAI because FAI's tool was "not something that will work for us at this time." JA1820.

The remaining "instances of confusion" are mostly unsupported statements from FAI's vice president. JA1798; JA2629. For example, FAI alleged confusion occurred with ACME Capital and at an Uncork Capital event but relied solely on hearsay testimony from its vice president about what others allegedly said to him. JA1798; JA2629.

Even if all the occurrences identified by FAI were incidents of actual confusion, they would amount to less than 0.01% of the email communications that Twic alone received from third parties during the same time period. JA1306-1312. This number does not account for the amount of emails FAI usually receives, the volume of social media tags either party receives, or the volume of phone calls either party receives, which would serve to make the percentage of actual confusion even smaller.

**The District Court Enters Summary Judgment**

At the close of discovery, Twic moved for summary judgment, requesting that the court find "there is no likelihood of confusion" and "dismiss[ FAI's] claims." JA496. FAI's claims are expressly identified in the accompanying memorandum as claims "for trademark infringement, unfair competition, and false designation of origin under the Lanham Act, unfair competition under California state law, and common law unfair competition." JA1254. Twic explained that "likelihood of confusion is a required element in each of [FAI's] claims," and that FAI's lack of evidence on that element warranted summary judgment in Twic's favor. JA1280.

The district court carefully considered the materials submitted by the parties and found that "there is no meaningful likelihood of confusion." (JA12). The court found that although the "parties use similar methods of advertising and delivering their products," FAI's mark is weak, there is a "lack of evidence of actual confusion," and the purchasers are sophisticated. (*Id.*). The court entered summary judgment in favor of Twic on the issue of likelihood of confusion. JA15.

**FAI Fails to Identify a Non-Trademark Theory for Its State Law Claims**

Although the district court found that FAI's failure to substantiate its likelihood of confusion resolved the Lanham Act claims, JA3, it slated the state law claims for trial and ordered the parties to confer on settlement. JA2641-2643. Thereafter, it became apparent that Twic and FAI had very different understandings of the scope of the state law claims. JA2648.

Twic understood that the state law claims could not depend on trademark infringement alone, as all trademark infringement requires likelihood of confusion. JA2648. Nonetheless, Twic could not identify any bad acts, other than trademark infringement, that FAI believed Twic committed. JA2648. FAI's amended complaint stated expressly:

> This is an action for federal trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), federal trademark infringement, unfair competition and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for unfair and deceptive trade practices under the California Business & Professions Code Section 17200, and for common law unfair competition, all arising from the Defendant's unauthorized and infringing use of the FORMA mark in connection with Defendant's employee benefits software platform.

JA225 (emphasis added). Thus, the "unlawful activities" identified in FAI's amended complaint were limited to Twic using its FORMA mark to provide its services in commerce. JA230-235. No further substantive facts were articulated in FAI's state law claims. JA238. Twic relied in good faith that the allegations of the Amended Complaint provided Twic with notice of the claims brought against it - namely, four claims based on trademark infringement. JA225-242.

In discovery, FAI consistently treated all its claims as based on trademark infringement. In FAI's initial disclosures, the identified documents were all directed to trademark infringement, and FAI described its damages as "related to [Twic's] sales of services under the infringing FORMA mark." JA2666-2669. FAI's expert report explained it was directed to "identifying damages, if any, arising from [FAI's] trademark infringement claims against Twic, Inc." JA2672. When an interrogatory

asked for damages for each cause of action FAI asserted in the suit, FAI responded that its damages were related to Twic's use of its mark, and that it was also seeking injunctive relief to prevent Twic "from engaging in the infringing activities." JA1080.

At all times prior to summary judgment, FAI treated its state law claims as claims for trademark infringement and did not identify any other unfair or deceptive act Twic allegedly undertook. FAI continued to do so at summary judgment, telling the Court during briefing that "[t]his trademark infringement case is about one thing: the likelihood of confusion Defendant Twic has caused by rebranding to 'Forma' …." JA349.

Twic asked FAI several times to identify the non-trademark infringement acts Twic allegedly undertook, since any such concerns were likely to be resolved through the reasonable settlement discussions ordered by the court. JA17; JA2649. FAI, however, continuously failed or refused to identify any such acts. JA17; JA2649.

Twic found itself in the unenviable position of having to prepare for a trial without knowing what bad acts Twic allegedly committed. JA2649. Being unable to fairly prepare for trial, Twic was forced to ask the district court for clarification on the scope of FAI's state unfair competition claims.

JA2645; JA2649-2650. Twic further inquired whether the court's finding of no likelihood of confusion resolved the state law claims if the court found FAI's only theory for its state law claims sounded in trademark infringement. JA2645; JA2649-2650.

In considering Twic's request for clarification, the court concluded that the complaint "describes all of [FAI's] claims, Lanham Act and state law alike, as 'arising from [Twic's] unauthorized and infringing use of the FORMA mark.'" JA18. Despite having an opportunity to identify any non-trademark theory for its state law claims during briefing, FAI failed to do so. JA18; JA2706-2725. The court therefore clarified that the state law claims were premised solely on a trademark theory and that those claims "require[d] a likelihood of confusion." JA18; JA21-JA23. Because FAI had "not identified any alternate theory on which it bases its state law unfair competition claims, it would be error to allow the state claims to go to trial in light of the Court's decision" on likelihood of confusion. JA23. The district court, therefore, dismissed FAI's state law claims. JA23.

## SUMMARY OF ARGUMENT

There is nothing confusing about this dispute. Twic and FAI sell non-competitive products and services that are purchased by sophisticated consumers as part of a sophisticated buying process. FAI failed to identify a single sale it lost because of Twic. FAI failed to identify a single purchaser who purchased FAI's products and services intending to purchase Twic's products and services (or vice versa). This is unsurprising. The consumers are sophisticated; the transactions are sophisticated; and the only similarity between the parties' marks - the string "forma" - is found in trademarks used by other third parties operating in the same market.

FAI tried to manufacture confusion by relying on a handful of contacts from end users of Twic's products and services (caused by inaccurate instructions) and from third parties. Even if all these contacts did involve individuals that were actually confused, the incidents identified by FAI would amount to less than a hundredth of a percent of the same type of contacts the parties received during the same time.

Because no reasonable consumer is likely to be confused between Twic and FAI, Twic sought summary judgment on the issue of likelihood

of confusion, requesting the court enter judgment against FAI on all claims. The district court agreed that no reasonable consumer was likely to be confused. After FAI failed to identify any non-trademark theory for its state claims of unfair competition, Twic asked the district court for clarification as to the scope of FAI's state claims and whether those claims could proceed on a trademark theory despite the court finding no likelihood of confusion. The court thereafter correctly found that FAI had always represented its state law claims as sounding in trademark infringement and had never put forth any other theory of unfair competition. Even after Twic requested clarification, FAI again failed to identify any non-trademark theory of unfair competition. In view of FAI's failure, the district court correctly found that FAI's state claims only sounded in trademark infringement and that the district court's finding that there was no likelihood of confusion also resolved those claims.

FAI was not entitled to a trial. The district court correctly found there is no likelihood of confusion between the parties' use of their respective marks, and that this finding resolves all claims between the parties. This Court should affirm and award Twic its fees associated with this appeal.

# ARGUMENT

## I. The Court Should Affirm the District Court's Entry of Summary Judgment Because AIA Failed to Adduce Sufficient Evidence of Likelihood of Confusion.

This Court exercises *de novo* review over the district court's entry of summary judgment. *Hodges v. Abraham*, 300 F.3d 432, 445 (4th Cir. 2002).

The ultimate question in a trademark infringement dispute is whether there exists a likelihood that an appreciable number of purchasers will be misled or confused as to the source of the goods and services in question. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 127 (4th Cir. 1990); *see also* 15 U.S.C. § 1114. A claimant is not entitled to relief unless it can show this likelihood of confusion. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984).

"To support a finding of infringement, [a trademark claimant] must show a probability, not just a possibility, of confusion." *N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel, LLC*, 293 F.3d 550, 554 (2d Cir. 2002). Courts are not concerned with "mere theoretical possibilities of confusion" or "de minimis situations" when determining a likelihood of confusion. *Elec. Design & Sales, Inc. v. Elec. Data Sys. Corp.*, 954 F.2d 713, 717 (Fed. Cir. 1992).

This Circuit identified the following factors to determine likelihood of confusion:

a) strength or distinctiveness of the mark;
b) similarity of the two marks;
c) similarity of the goods/services the marks identify;
d) similarity of the facilities the two parties use in their businesses;
e) similarity of the advertising used by the two parties;
f) defendant's intent;
g) instances of actual confusion;
h) quality of the defendant's product; and
i) sophistication of the buyers.

*Pizzeria Uno*, 747 F.2d at 1527; *Perini,* 915 F.2d at 127. When no reasonable juror could find a likelihood of confusion exists between the parties' marks, summary judgment is appropriate. *See CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267-274 (4th Cir. 2006).

**A. FAI's Asserted Instances of Actual Confusion Are *De Minimis* even if Credited.**

"While a showing of actual confusion is not required to establish infringement, an absence of actual confusion, or a negligible amount of it, between two products after a long period of coexistence on the market is highly probative in showing that little likelihood of confusion exists." *Aktiebolaget Electrolux v. Amratron Int'l, Inc.*, 999 F.2d 1, 4 (1st Cir. 1993) (minimal instances of actual confusion over six years weighed heavily

against likelihood of confusion). Indeed, the "absence of any evidence of actual confusion over a substantial period of time creates a strong inference that there is no likelihood of confusion." *Swatch AG v. Beehive Wholesale LLC*, 739 F.3d 150, 162 (4th Cir. 2014) (citation modified).

*De minimis* confusion is a lack of actual confusion. *CareFirst*, 434 F.3d at 268 (*de minimis* confusion does not prove actual confusion; "a confusion rate of 2 percent [is] hardly a sufficient showing of actual confusion."); *Sunbeam Corp. v. Equity Indus., Corp.*, 635 F. Supp. 625, 635 (E.D. Va. 1986) (entering summary judgment in defendant's favor where only 1.4% of survey respondents were confused); *IDV N. Am., Inc. v. S&M Brands, Inc.*, 26 F. Supp. 2d 815, 832 (E.D. Va. 1998) (dismissing claims where 2.4% survey population confusion "prove[s] the absence, rather than the presence, of likely confusion"); J. Thomas McCarthy, (confusion of less than 10% is evidence of no likelihood of confusion); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1244 (10th Cir. 2013) (holding confusion that was at most 1.5% is *de minimis* and "insufficient to justify relief"). A plaintiff's "failure to uncover more than a few instances of actual confusion creates a presumption against likelihood of confusion in the future." *George & Co., LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 399 (4th Cir. 2009).

To determine whether actual confusion is *de minimis*, the "evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion …." *George & Co.*, 575 F.3d at 398 (quoting 5 *McCarthy on Trademarks & Unfair Competition* § 23:14); *accord Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 95 (4th Cir. 1997).

Here, FAI identified approximately 29 occurrences over approximately 2.5 years that it asserted were instances of actual confusion. JA1306, JA1798. The majority of those occurrences involve emails received by FAI that were intended for Twic. JA1307-JA1311. During the same time period, Twic received 420,672 emails. JA1312. Even if all 29 incidents were truly instances of actual confusion (which they are not), they amount to just 0.007% of email communications intended for Twic. This percentage does not consider the amount of emails FAI usually receives, which would serve to make the percentage of "actual confusion" even smaller. A minority of the occurrences identified by FAI involve social media mistags or phone calls. The 0.007% rate calculated above does not consider the number of social media tags or phone calls either party receives, which would further reduce the percentage of "actual confusion." Thus, even if every instance

FAI asserts is actual confusion was, in fact, a case of confusion, those instances would be *de minimis*.

FAI conceded there were less than thirty possible instances over two and a half years. JA1798. FAI claimed its customers have more than 500 employees or sales teams of more than 100 people. JA1796. FAI also claimed its potential customers number in the thousands. JA1797. Despite all these potential points of contact for "confusion" to occur, FAI identified less than thirty occurrences over 2.5 years.

FAI nonetheless claims there is "a 13% confusion rate." FAI Br. at 28. To reach this number, FAI takes its "instances of confusion" and divides it by the number of FAI's and Twic's actual customers. *Id.* at 41-42. When considering the amount of actual confusion, however, apples must be compared to apples, not oranges. This Circuit has explained how to determine the amount of actual confusion:

> [E]vidence of the number of instances of actual confusion must be placed against the background of *the number of opportunities for confusion* before one can make an informed decision as to the weight to be given the evidence. If there is a very large *volume of contacts* or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight.

*George & Co.*, 575 F.3d at 398 (quoting 5 *McCarthy on Trademarks & Unfair Competition* § 23:14 (emphasis added)).

When considering the types of contact that gave rise to the "instances of confusion" alleged by FAI, those instances comprise less than one hundredth of a percent of those contacts. FAI instead chose to identify as instances of confusion emails from end users (individual employees of Twic's customers) of Twic's software. (JA1307-JA1311). FAI chose to count multiple emails from the same sender as different instances. *See, e.g.*, JA1307 (each email from Ms. Zarate counted as a separate instance). FAI chose to count multiple emails from the same customer as different instances. *See, e.g.*, JA1307-JA1308 (Rubrik (5 emails) and Grammarly (3 emails) each considered a separate instance). FAI chose to count social media tags from non-customers as instances. *See, e.g.*, JA1306-JA1307 (Medhealth Outlook LinkedIn mistag). If FAI wants each of these contacts to be counted as a separate occurrence of actual confusion, then these contacts should be compared to the volume of similar contacts to determine if they are *de minimis.*

If, instead, FAI wants to use actual customers to determine actual confusion, then it should compare apples-to-apples: the number of

customers either party obtained because of confusion against the number of total customers between the parties. That number is zero. Neither party identified any customer it obtained due to confusion with the other.

**B. FAI's "Actual Confusion" Evidence Is Speculative.**

"To establish trademark infringement, a plaintiff must prove that it owns a valid and protectable mark, and that the defendant's use of a 'reproduction, counterfeit, copy, or colorable imitation' of that mark creates a likelihood of confusion." *George & Co.*, 575 F.3d at 393 (citations omitted). The burden is on FAI to show its "instances of confusion" are, in fact, actual confusion in a Lanham Act context.

FAI conceded it did not communicate with most of the individuals involved in the supposed "instances of confusion." JA1306-1311. FAI did not identify any of the individuals or companies as witnesses in this case. JA1312. It does not have admissible evidence as to what was actually believed or understood by any of those it asserted were "confused." *See Carefirst*, 434 F.3d at 268 (finding evidence did not show actual confusion when the plaintiff provided "no evidence that the . . . respondents were confused in a way relevant to the likelihood-of-confusion analysis"). FAI's "instances of confusion" are based solely on its own speculation as to the

beliefs and understandings of the individuals involved. This is not evidence of actual confusion. *See id.* (no actual confusion where evidence as to what the respondents understood was limited to "mere speculation").

**C. The Relevant Market for Purposes of this Appeal is "HR Tech."**

The determination of several *Pizzeria Uno* factors hinges on how the relevant market for the parties' goods and services is defined. A broader definition captures a greater variety of market goods and services. This makes it more likely that the parties' goods and services are related, allowing the "similarity of the goods and services" factor to weigh in favor of finding a likelihood of confusion. A broader definition, however, means that factors such as the strength of the mark, which considers third party use of the mark in the relevant market, could cut the other way. This is the dilemma a trademark plaintiff faces in defining the market when the parties' goods and services are not the same.

FAI contends the market for its and Twic's services is "HR Tech," which FAI expressly defined as "any technology that supports and enables the human resources within a business." JA1300. Twic, meanwhile, asserts that its market is the employee benefits market. JA504; JA1283. This market does not include the compensation or operations (e.g., payroll, training,

onboarding, etc.) portions of the broader HR landscape. JA504, JA1283. Under FAI's definition of the market, the parties' goods and services are related. Under Twic's, they are not.

While Twic reserves the right to contest whether the parties' products and services are related should this case go to trial, "for the purposes of [the summary judgment] motion, [Twic] has adopted [FAI's] delineation of the market space and conceded that this factor 'somewhat favors [FAI].'" JA8. In other words, for purposes of this appeal, the relevant market for both FAI and Twic is FAI's preferred definition, that is, including "any technology that supports and enables the human resources within a business." This results in the factor of the "Similarity of the Goods or Services Offered" weighing in favor of FAI.

Nonetheless, what is good for the goose must also be good for the gander. FAI wanted to define the market as covering "any technology that supports and enables the human resources within a business" to enable the "similarity of the goods and services" factor to weigh in its favor. That choice, however, carries additional ramifications, namely, that when considering the strength of the mark, this same, broad market scope should also apply.

**D. FAI's FORMA.AI Mark Is Weak.**

"The first and paramount factor" under the *Pizzeria Uno* test "is the distinctiveness or strength of the two marks." 747 F.2d at 1527. "The strength of a mark is the degree to which a consumer in the relevant population, upon encountering the mark, would associate the mark with a unique source," and "is evaluated in terms of" both "conceptual strength and commercial strength." *Carefirst*, 434 F.2d at 269.

**1. FORMA.AI Is Conceptually Weak.**

Conceptual strength "focuses on the linguistic peculiarity of the mark considered in relation to the product, service, or collective organization to which the mark attaches." *Id.* at 269 (citation modified). Even if a mark is suggestive in its entirety, it does not follow that the mark is conceptually strong. *Grayson O Co. v. Agadir Int'l, LLC*, 856 F.3d 307, 315 (4th Cir. 2017).

FAI's mark is FORMA.AI. The ".AI" portion of the mark is a generic top level domain technology companies use to associate themselves with artificial intelligence (AI) based technology. The "FORMA" portion of the mark is widely used by third parties operating in the same market as FAI, HR Tech. The combination—FORMA.AI—does not bring any new or unique commercial impression and remains weak.

**a. AI is a Ubiquitous Abbreviation for "Artificial Intelligence."**

The term "AI" has a commonly understood meaning: "artificial intelligence." JA1306. As the district court observed correctly, "[i]f the 'AI' identifier" for artificial intelligence "is not already generic, it is rapidly approaching that point." JA6.

Tech companies frequently use the top-level domain .ai to "associate themselves with AI technology." JA1306. FAI's services are directed to its "artificial intelligence-based software platform." JA226. "AI" describes a feature of FAI's services and is extremely weak.

**b. The Conceptual Strength of FORMA is Diluted by Third Party Use in the "HR Tech" Market.**

"'The frequency of prior use [of a mark] in the same field of merchandise or service[]' illustrates the mark's lack of conceptual strength." *Carefirst*, 434 F.3d at 270 (quoting *Pizzeria Uno*, 747 F.2d at 1530-31). "A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *Id.* at 270 (citations omitted). "[C]onsumers are unlikely to associate a mark with a unique source if other parties use the mark extensively." *Grayson O*, 856 F.3d at 315.

In considering the weakness of a mark due to third party use, courts look at both third-party registrations at the USPTO and third-party use in commerce. *See Petro Stopping,* 130 F.3d at 93 ("[T]he frequency with which a term is used in other trademark registrations is indeed relevant to the distinctiveness inquiry under the first likelihood of confusion factor."). With regard to third-party registrations, when a mark is used in many registrations in a particular Class, it is evidence "that some segment of the composite marks which both contesting parties use has a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak." *Id.* at 94 (citation omitted).

FAI's contention that the market of related products and services is "HR Tech" has been accepted for purposes of the summary judgment motion and this appeal. As detailed above, FAI defines the "HR Tech" market as including "any technology that supports and enables the human resources within a business." JA1300.

There are a number of third-party registered marks at the USPTO that (1) include the string 'forma'; and (2) include a goods and services

description that overlaps with HR Tech.[4] Under USPTO guidelines for examining trademark applications, if a market limitation is not included in a goods and services description, then the description covers all markets. Trademark Manual of Examining Procedure (TMEP) § 1207.01(a)(iii) (May 2026) ("If the cited registration describes goods or services broadly, and there is no limitation as to their nature, type, channels of trade, or class of purchasers, it is presumed that the registration encompasses all goods or services of the type described, that they move in all normal channels of trade, and that they are available to all classes of purchasers."). As there are no market limitations in the following registrations, their scope necessarily includes use in the HR Tech field:

- COFORMA, Reg. No. 6277107, for "Research, development, design and upgrading of computer software; Computer services, namely, integration of computer software into multiple systems and networks; Consulting services in the field of providing online, non-downloadable software and applications." (no claimed limitations and therefore applies to HR software)

- DEALFORMA, Reg. No. 5626905, for "Providing business information, namely, commercial corporate and statistical information provided on-line from a computer database or the Internet." (no claimed limitations and therefore applies to HR information)

[4] A review of Class 42 more generally reveals more than 25 registrations or allowed applications that include FORMA. JA1312-1314.

- INFORMAI, Reg. No. 5772904 for "computer software consulting" (no claimed limitations and therefore applies to HR software consulting)

- MYPERFORMA, Reg. No. 5681707, for "software for use in maintaining, collecting, analyzing and interpreting performance metrics and KPI (key performance indicators) of individuals and groups engaged in … employment settings, based on individual responses to survey questions" (no limitations and therefore applies to HR)

- ONEFORMA, Reg. No. 6611137, for computer programs "for use in database management and electronic storage of data" and "for creating searchable databases of information and data," software that "provides real-time, integrated business management intelligence by combining information from various databases and presenting it in an easy-to-understand user interface." (no claimed limitations and therefore applies to HR software for managing HR related data)

- PERFORMA, Reg. No. 7013364, for "software for managers of investment funds for use in financial portfolio management" (breadth captures 401(k), a benefit administered by HR)

- PERFORMA ENTERPRISE, Reg. No. 5855797, for "Downloadable software application for use in mobile video training of police, first responders, and military, on the subject of critical decision making, preparedness, communication tactics, deescalation, appropriate use of force, cognitive biases, situational awareness, mental illness sensitivity, and law, policies, and procedures" (job training is a function of HR)

- PERFORMA LABS, Reg. No. 6577801, for "Providing temporary use of nondownloadable software for providing client access for secure business document management, namely, searching, organizing, filing, reviewing, and storing documents" (no

claimed limitations and therefore applies to software for HR documents)

- PROFORMA PROVISION, Reg. Nos. 6389830, 6389862, 6342218, for "design and development of computer software for the improvement of the business operations of franchisees." (no claimed limitations and therefore applies to software for the improvement of HR business operations of franchisees)

- SAAS PROFORMA, Reg. No. 6286048, for "[SAAS] services featuring software for creating financial projections and managing, reporting, and scaling financial reports." (no claimed limitations and therefore applies to HR software for financial reports, which could be used for determining sales compensation)

- SCIFORMA, Reg. No. 2862807, for "computer programs…that enable companies to develop project plans for enhancing resource utilization for use [in] … business management and instructional manuals sold together as a unit" (no claimed limitations and therefore applies to computer programs for HR management)

- TRANSFORMAI, Reg. No. 5781496, for "computer software consulting" (no claimed limitations and therefore applies to HR software consulting)

FAI also offers Class 35 business consultation services and business collaboration services under its FORMA.AI mark. JA248. In Class 35, FAI's FORMA.AI mark coexists with FORMA (Reg. No. 6721764) for "consulting services in the fields of business organization and management" and FORMA TAX (Reg. No. 4557274) for "business information and accounting advisory services." JA1312-1314.

There are also users whose marks include FORMA and who offer HR consulting or "HR Tech" products and services. One of HR's duties is to train employees. SCIFORMA, DIGIFORMA, FORMA, FORMA LEADERS, and FORMA LMS all offer some version of employee training (either through consultation, training software, or a combination thereof). JA1314-1315. BPMobile's FORMA pdf editor can be used to fill out forms, to include forms that HR departments utilize. JA1315. FLOWFORMA is used for HR process automation. JA1314. INFORMACAST allows a workplace to send alerts to employees about office closures (something HR usually handles). JA1315. FORMA VISION offers teleconference software; HR departments engage in Internet-based teleconferences. JA 1315.

These users all co-exist with FAI, offering products and services in the market FAI defined as the relevant market, under names that include FORMA. As the district court observed correctly, Twic "produced ample evidence to demonstrate that the components of [FAI's] mark are within wide use throughout the shared market class." JA5. Although FAI asserts that "Twic offered no evidence that these marks were . . . actually used among HR technology firms" (FAI Br. at 19), there was a plethora of evidence of many FORMA-containing marks for HR Tech and consulting.

Indeed, the District Court described the evidence before it as including third-party users "targeting their [software] platforms specifically to human resources applications." JA5. FORMA is therefore weak in the relevant market.

**c. FAI Mischaracterizes Twic Testimony About the Memorability of Its Mark.**

FAI relies on select deposition testimony to try to circumvent the substantial third-party use of FORMA in the HR Tech market. In particular, FAI asserts that Twic witnesses testified that Twic's FORMA mark was not "undermined" by four other users of marks that include "forma." FAI Br. at 44-45. FAI, however, fails to provide the relevant context of that testimony. At deposition, Twic explained that it did not consider its market to be "HR Tech" in a broad sense, but instead understood the HR space to consist of three separate markets: employee benefits, core compensation, and operations. JA1327-1328; *see also* JA504 (declaration testimony regarding same). Twic's testimony was therefore premised on its definition of the market - the employee benefits portion of HR only. JA479 (Twic's understanding the market is "professionals in the HR ***benefits*** industry" (emphasis added)); JA2229 ("consumers can use Twic's FORMA name to

distinguish between Twic and other providers . . . *if the customer is in the benefits space*" and explaining that the answers are made "in the context – like how do we define consumer I think is the key") (emphasis added). Twic found its mark "super memorable" and did not believe the third-party users diluted Twic's mark because Twic understood those users *were not offering products and services in the employee benefits market*. Twic did not testify that, under FAI's broad "HR Tech" definition of the market, Twic believed the third-party marks did not dilute "forma."

FAI did not want Twic's market to be employee benefits. FAI wanted Twic's market to be the broader "HR Tech" market in order to assert that FAI's goods and services and Twic's goods and services were related and not, as Twic contends, in separate markets. FAI's choice to expand its definition of the relevant market to "HR Tech" in order to claim the parties' products and services are related, however, means that third parties in the "HR Tech" market (regardless of whether they were directed to employee benefits or some other HR functionality) are *also* part of the relevant market and would be able to dilute the parties' respective marks. Under FAI's chosen market of HR Tech, FORMA is conceptually weak.

**d. The District Court Correctly Concluded the Conceptual Strength of FORMA.AI is Suggestive but Weak.**

FAI repeatedly mischaracterizes the district court's Order. For example, FAI asserts that court determined that FORMA.AI was descriptive. FAI Br. at 44-45. The court actually held that FAI's "mark is, at least, suggestive." JA5. Because "the suggestive 'designation does not resolve the mark's conceptual strength,'" the court then considered whether third-party use diluted the conceptual strength of FORMA.AI. JA5 (quoting *CareFirst*, 434 F.3d at 270).

FAI also contends that the district court "never considered FORMA.AI as a whole." FAI Br. at 47. The district court, however, did consider the mark as a whole, finding that, with regard to FAI's FORMA.AI, "appending two conceptually weak identifiers [did] not create a mark stronger than the sum of its parts." JA6. Indeed, the court made clear that its analysis addressing "each component of the mark . . . in turn" was "for purposes of discussion only." JA5. The Court should discredit FAI's mischaracterizations.

**2. FORMA.AI Is Commercially Weak.**

Commercial strength looks at whether "a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." *Grayson O*, 856 F.3d at 316 (citations omitted). "To evaluate a mark's commercial strength, we consider the owner's advertising expenditures, consumer studies linking the mark to a source, sales success, unsolicited media coverage of the product, attempts to plagiarize the mark, and the length and exclusivity of the mark's use." *Passport Health, LLC v. Avance Health Sys.*, 823 F. App'x 141, 148 (4th Cir. 2020) (citation modified); *see also Grayson O*, 856 F.3d at 316. Of these, consumer study evidence is considered the most "telling" and is preferred for showing how consumers understand a mark. *George & Co.*, 575 F.3d at 396. "[E]vidence of extensive third-party use also demonstrates that [the] mark lacks commercial strength …." *Carefirst*, 434 F.3d at 270; *see also Passport Health*, 823 F. App'x at 148 ("Third-party use also undermines a mark's commercial strength.")

The district court's finding that "the FORMA.AI mark is not in widespread or meaningful commercial use" is well supported by the record. JA7. FAI testified that it did not "think the mark FORMA.AI is

widespreadly used in the United States." JA1302-1303. The evidence before the district court supported this concession, as the record included only a handful of articles about FAI and its services. JA6. Moreover, FAI's sales and advertising expenditures are low, and FAI only has 23 customers in the United States. JA6; JA1300-1303. FAI spent less than $5 million on advertising in the United States from 2016 through early 2024. JA1302. Approximately 1/3 of those costs were spent paying employees. JA1302. FAI does not engage in substantial commercial use in the United States.

The remaining considerations further underscore that FORMA.AI lacks commercial strength. FAI did not produce any consumer studies. JA6. And FAI does not contest Twic's innocent intent. FAI Br. at n.2. FAI is not the exclusive user of the string "forma" used as part of marks in the HR Tech space. *See* subsection (b), *supra*.

FAI argues its paltry use should not matter since its "marketing matches its market" and its market is comprised of "niche customers." FAI Br. at 17. This argument is squarely contradicted by FAI's assertion that the relevant market in which it and Twic operate is the "HR Tech" market. Indeed, FAI defined the HR Tech market as "any technology that supports and enables the human resources within a business," (JA1300), not "niche

customers." FAI once again seeks one rule for defining the market to help it on some *Pizzeria Uno* factors, and the opposite rule for defining the market to help FAI on others.

**3. FORMA.AI is a weak mark.**

The district court's findings that FORMA.AI is conceptually weak and commercially weak applied the proper legal rules and were supported by the evidence. JA4-JA7. There is no question that the "only reasonable determination a jury could reach is that FORMA.AI is a weak mark." (*Id.*).

**E. The Only Similarity Is the Word "forma."**

"In testing for similarity" of the marks, the allegedly infringing use must be examined "in the context in which it is seen by the ordinary consumer." *Grayson O,* 856 F.3d at 317 (citation omitted); *see also Anheuser-Busch, Inc. v L&L Wings, Inc.*, 962 F.2d at 316, 319 (4th Cir. 1992) (to determine whether mark usage results in a likelihood of confusion, "we must examine the allegedly infringing use in the context in which it is seen by the ordinary consumer…"). Therefore, marks must be analyzed in their entirety and in the context of how they are actually used in commerce.

Marks are compared in terms of "whether there exists a similarity in sight, sound, and meaning which would result in confusion." *George & Co,*

575 F.3d at 396. This includes considering the "style, color, [and] presentation of the marks…." *Grayson O,* 856 F.3d at 318. Even when marks contain the same dominant term, the use of different fonts, colors, and artistic elements can render marks different. *Id*. (marks found to be different despite each containing "450"; even if 450 was dominant, the differences in font, color, and artistic elements rendered the marks highly distinguishable). Further, unless products and services are sold through the same stores and therefore would appear side by side on a shelf (or webpage), "relying solely on a side-by-side comparison of the marks to determine the likelihood of confusion would be inappropriate." *Id*. at 317.

**1. The Parties' Marks, as Used in the Market, Are Distinguishable.**

FAI and Twic each use logo marks for their respective products and services. FAI's logo mark is shown below, left; Twic's logo mark is shown below, right.

| FAI | Twic |
| --- | --- |
| FORMA.AI | forma |

FAI's logo includes a 3-dimensional F in white and purple, followed by "FORMA.AI" in all capital letters. Twic's logo involves a geometric shape

comprised of blue, red, pink, and yellow circles followed by "forma" in all lowercase letters. While Twic concedes that both parties' marks include the string "forma," the marks in their entirety are distinguishable.

FAI argues that because it has a word mark registration, a comparison of the marks should not be limited to how FAI uses its mark in commerce. FAI Br. at 54. That is not the law of this Circuit, which requires assessing how the parties use their marks *in commerce*. *See Grayson O*, 856 F.3d at 316.

FAI argues that Twic does not use its logo mark in commerce by relying on materials that do not show how Twic actually uses its brand. FAI Br. at 54. FAI cites only to *draft* text for use in announcements to consumers (FAI Br. at 54), not a version of the announcement that was actually sent to a consumer. JA654; JA657-660. FAI also claims that "Twic's business cards visually separate 'forma' from the logo." FAI Br. at 54. Notably, FAI does not provide Twic's actual business card. Instead, it points at a slideshow from graphic designers to show examples of how to use Twic's color palette as part of Twic's branding. JA511-512. Of course, this instructional slideshow was never shown to business consumers. FAI also relies on Google automatically generating a "forma.ai" advertising

keyword for Twic's search engine advertising. FAI Br. at 55. It is well-settled that internet keyword advertising is not trademark use unless the keyword appears in the actual advertisement. *See* 5 *McCarthy on Trademarks & Unfair Competition* § 25A:7. FAI did not identify any resultant ad that included "forma.ai." In sum, none of this evidence shows Twic's actual use in commerce and therefore it is not relevant.

FAI also attempts to read illusory limitations into testimony that Twic "advertises and promotes its products and services under the name FORMA." FAI Br. at 55. The limitations advanced by FAI are not actually present nor in any way suggested in the testimony. JA610.

Finally, FAI cites deposition testimony about an article written by a Twic founder, a webinar, and a third-party article to assert that Twic does not use its logo in commerce. JA2091-2097. That testimony, however, identifies the *logo being used* in the webinar (JA2094), and discusses a third-party article that is not use by Twic. The remaining item is a sentence identifying an article's author, stating "Jason Fan is the CEO and cofounder of Forma." JA2092. FAI provides no information as to how this descriptive sentence is likely to cause consumer confusion.

The parties use their respective marks as logo marks. Their webpages are prominently branded with their logos. JA1303-1304; JA1288-1291. FAI's logo is used in the forum though which FAI mainly advertises and sells its products. JA1303-1304 (FAI "primarily advertises and promotes its services… . . . via its www.forma.ai website."). Twic primarily sells through brokers and uses its logo on its broker portal pages. JA1286-1288. FAI failed to demonstrate that the parties' marks are limited to the linguistic elements or that they share any similarity other than that both include the string "forma." Instead, it is clear that the marks, as most commonly encountered by consumers in commerce, are the parties' respective logo marks.

**2. The Only Similarity Between the Marks, the String "Forma," is Commonly Used in the HR Tech Marketplace.**

It is well accepted that widespread use of an element as part of a trademark is evidence that "the public would readily distinguish the differences" between marks incorporating that element and that confusion is not likely. *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 1401 (C.C.P.A. 1974). When consumers see an element commonly used in a mark to offer a type of service, they look to the other portions of the mark

to distinguish the source of the product or service. When there is substantial third-party use of a mark element, consumers give great weight to the other portions of the mark and are not likely to be confused by the inclusion of the widely used, common element. *Carefirst of Md., Inc. v. FirstHealth of the Carolinas, Inc.*, 77 U.S.P.Q.2d 1492, 1509 (T.T.A.B. 2005), *aff'd*, 479 F.3d 825 (Fed. Cir. 2007) (third party use mitigates against confusion); *In re Broadway Chicken, Inc.*, 38 U.S.P.Q.2d 1559, 1565-66 (T.T.A.B. 1996) (no likelihood of confusion between two restaurants whose marks started with BROADWAY due to large number of third-party users).

As discussed above, the "HR Tech" market contains many FORMA users. Registered users of forma-containing marks co-exist with FAI on the Principal Register at the USPTO. There is even a third-party registration for FORMA that covers "consulting services in the field of business organization and management," which implicitly includes consulting regarding HR organization and management. JA670; JA1312-1313. Nonetheless, the USPTO did not cite any of these marks against the application that became FAI's registration for FORMA.AI. JA1305-1306. Non-registered users also offer technology used by HR departments. Examples include FORMA LMS, DIGIFORMA, and SCIFORMA, which

provide corporate training software; FLOWFORMA for HR automation software; and INFORMACAST for software that allows a company to send alerts to its employees (e.g. an office closing due to inclement weather). JA1314-1315. These users are also co-existing with FAI in the "HR Tech" marketplace, despite including "FORMA" in their names.

Given the substantial third-party use of "FORMA," consumers in the HR Tech space are conditioned to look to other portions of these marks to distinguish between the users. The non- FORMA portions of the parties' respective marks are unique and do not bear any resemblance. Consumers who can distinguish between FAI and the other FORMA users in the HR Tech space can also distinguish between FAI and Twic.

### F. The District Court Held Correctly that the Similarity of the Facilities Used Factor is Neutral.

The district court deemed this factor "neutral" because, although "similar channels are occasionally utilized, the parties do not receive the bulk of their business from the same sources." JA8. This finding is correct. To determine whether the type of facilities are similar or dissimilar, courts look at the parties' distribution modes for their products. *Swatch*, 739 F.3d at 160. When parties primarily use different modes of distribution, this

factor weighs against finding a similarity of facilities. *Id*. at 160-61. Minimal overlap in sales is insufficient to show the parties use similar facilities, *id*. at 161, and "both parties us[ing] web pages and articles republished on third-party websites" is insufficient to show the facilities used by the businesses are similar. *U.S. Conf. of Catholic Bishops v. Media Rsch. Ctr*., 432 F. Supp. 2d 616, 628 (E.D. Va. 2006); *see also Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 262-63 (4th Cir. 2007) (finding products not sold through the same facilities despite both parties' products being sold on the Internet when sales were made through different websites).

As the district court observed, between 70% to 90% of Twic's services are predominantly sold through employee benefits brokers. JA8, JA1284. Meanwhile, FAI admits that "the bulk of [FAI's] business comes from online sales," namely, its www.forma.ai website. JA8, JA1756-1757, JA1760-1763; *see also* JA1302-1304 (FAI's "software platform is primarily offered [and] sold . . . online. The Internet is the relevant channel of trade"). The court's finding that, despite some overlap, the parties do not mostly receive their business from the same sources aligns with the record evidence.

FAI argues this factor should weigh in its favor because "the ultimate buyer . . . is the same." FAI Br. at 61. The district court, however, concluded

correctly that "there is some overlap in [the parties'] customer bases," which then weighed against the fact that the bulk of each party's sales coming through different channels, rendering the factor neutral. JA8. The court's rationale and finding is correct.

**G. Similarity of the Advertising Slightly Favors FAI**.

Although the district court found this factor slightly favors FAI, FAI nonetheless advances arguments regarding this factor. FAI Br. at 61-62. Twic agrees that the parties both advertised via search engines, both use LinkedIn, and both attend at least some of the same trade shows. JA8-9. For purposes of this appeal, Twic does not contest that this factor slightly favors FAI.

Although the Court found that this factor slightly favored FAI, FAI nonetheless provides arguments regarding it. The district court considered the issues identified by FAI in its brief and agreed with FAI that the parties both advertised via search engines, both use LinkedIn, and both attend at least some of the same trade shows. JA8-9. Twic did not cross-appeal or otherwise challenge the District Court's findings. There does not appear to be an issue with this factor. FAI Br. at 61-62. No reversible error is

identified and the District Court's findings for this factor should be affirmed.

### H. Twic Did Not Intend to Cause Consumer Confusion.

This factor undisputedly favors Twic. As the district court concluded correctly, "the record does not support a finding that [Twic] intended to infringe on [FAI's] mark, or to take advantage of any goodwill that the [FAI] had accumulated." JA9. FAI does not contest this finding. FAI Br. at n.2. There is no dispute that the district court correctly found that "[t]his factor weighs against a finding of likelihood of confusion." JA9.

### I. The Quality of Twic's Product Factor Is Neutral.

There is no dispute that this factor is neutral. The district court found that "neither party has contended that the other is offering a lower-quality or inferior product or service." JA11. FAI does not contest this finding. FAI Br. at 59.

### J. The Parties' Goods and Services Are Purchased by Sophisticated Consumers in Sophisticated Transactions.

"Although no one factor is dispositive of the 'likelihood of confusion' inquiry, the sophistication and expertise of the usual purchasers can preclude any likelihood of confusion among them stemming from the

similarity of trade names." *Perini*, 915 F.2d at 127; *see also George & Co.*, 575 F.3d at 393 (likelihood of confusion can turn on the sophistication of consumers). Sales that involve multiple meetings that are "tailored to the customer and the product" are purchases that are "'unusual and complex' and made with 'care and deliberation' after researching the products." *CDOC, Inc. v. Liberty Bankers Life Ins. Co.*, 844 F. App'x 357, 359, 363 (Fed. Cir. 2021) (finding purchasers of insurance to be discerning purchasers).

Sophisticated consumers purchase both parties' products and services through sophisticated purchasing processes. FAI's customers are large, multi-national companies with a sales force. JA10-11; JA1301. The purchasing process involves multiple meetings and investigations before a company purchases FAI's products and services. JA11-12; JA1304-1305; JA1763. The key decision makers are C-suite officers, such as the CEO, CHRO, or CFO. JA10; JA1304-1305. Even FAI concedes its customers are sophisticated. FAI Br. at 57. Twic also sells its products and services to businesses and not individuals. JA10; JA1282-1283. Twic's products and services are typically sold through employee benefits brokers - specialists in employee benefits who are hired by companies to help that company create an employee benefits program. JA8; JA1283-1285. The professionals

at the ultimate customer companies who decide to purchase Twic's products are corporate officers who focus on employee benefits. JA10; JA1285. Twic spends months presenting and promoting its products and services to a potential company customer before the sale occurs. JA10-12; JA1283-1285; JA1730-1731.

Both parties' customers are sophisticated businesspeople. JA1730-1731; JA1763. As the district court explained, these "decisionmakers are often C-suite executives, who have a strong incentive to thoroughly investigate the sellers of any products they purchase." JA10. Both parties' products and services are purchased after long, in-depth sales processes with multiple meetings. There are "numerous layers of scrutiny" in these processes. JA11. The processes "involve multiple meetings 'tailored to the customer and the product,' and which are 'unusual and complex and made with care and deliberation after researching the products.'" JA10 (quoting *CDOC Inc.* 844 F. App'x at 359 ). The sophistication of the purchaser, as well as the sophistication of the purchasing process, weighs heavily against finding a likelihood of confusion.

FAI argues that this factor would not weigh against likelihood of confusion if there is actual confusion. FAI Br. at 57-58. FAI, however, did

not produce any evidence of sales resulting from actual confusion or amongst the decisionmakers purchasing the parties' respective products and services. *See* JA10 (noting FAI "has produced no evidence showing this type of confusion" when discussing confusion among "sophisticated companies . . . attempting to purchase a software suite to help manage their entire roster of employees at once.").

FAI also argues that sophistication of the purchasers should not apply "given the low cost of [FAI's] and Twic's goods." FAI Br. at 58. FAI relies on testimony regarding the relative cost of Twic's software in comparison to a company's overall benefits budget, while ignoring how that same testimony explained that Twic's software also manages the funds each employer provides to each of its employees for their benefits. JA2216. No responsible businessperson would provide substantial sums of money to a third-party software platform to manage without carefully investigating that platform and the company behind it. Even considering the software alone, software subscriptions are based on the number of the customer's employees. JA2212-2216. For a customer the size that FAI serves - large, multinational companies with hundreds to thousands of employees

- the resultant spend quickly becomes thousands of dollars. That is hardly a "low cost" budget item.

Moreover, even if the parties' goods and services were low cost (which they are not), they are still purchased by sophisticated businesspeople via complex sales processes that last months. JA1730-1731; JA1763. These are not careless purchases, but thoughtful, complex, long transactions. (*Id.*) The consumers are sophisticated and the parties' goods and services are purchased via complex transactions. For all these reasons, this factor weighs against a finding of likely confusion.

**II. The District Court's Did Not Abuse Its Discretion by Reconsidering Its Prior Summary Judgment Ruling and Did Not Err by Dismissing FAI's State Law Claims.**

**A. The Court Did Not Abuse Its Discretion by Reconsidering Its Prior Summary Judgment Ruling.**

Orders on motions for reconsideration (and clarification) are reviewed "for an abuse of discretion." *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017). The "district court retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003).

A motion for reconsideration for an order "that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties" is governed by Federal Rule of Civil Procedure 54(b). These motions are "committed to the discretion of the district court" and "the goal is to reach the correct judgment under the law." *Ficep Corp. v. Voortman USA Corp.*, No. WDQ-13-0429, 2015 U.S. Dist. LEXIS 37013, at *10 (D. Md. March 24, 2015) (quoting *Am. Canoe Ass'n*, 326 F.3d at 515; *Netscape Commc'ns Corp. v. ValueClick, Inc.*, 704 F. Supp. 2d 544, 546-47 (E.D. Va. 2010)). Courts consider motions for clarification of non-final orders under the same standards as such motions for reconsideration. *See, e.g.*, *State Auto Prop. & Cas. Ins. Co. v. Campbell*, No. 5:18-CV-173, 2020 U.S. Dist. LEXIS 248311, at *3-4 (N.D. W. Va. July 14, 2020) (granting motion for clarification and reconsideration under Rule 54(b)).

Courts may reconsider their interlocutory decisions if those decisions were erroneous or would cause manifest injustice. *Am. Canoe,* 326 F.3d at 515. A "district court retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to the final judgment when such [reconsideration and modification] is warranted." *Id.* at 514-15. Further, "[m]otions for

reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment." *Id*. at 514.

Here, the district court properly exercised that discretion by revisiting its prior ruling after Twic was forced to ask the district court for clarification on the scope of FAI's state unfair competition claims. JA2645; JA2649-2650. In considering Twic's request for clarification, the court correctly concluded that the complaint "describes all of [FAI's] claims, Lanham Act and state law alike, as 'arising from [Twic's] unauthorized and infringing use of the FORMA mark.'" JA18. Despite having an opportunity to identify any non-trademark theory for its state law claims during briefing, FAI failed to do so. JA18; JA2706-2725. The court therefore clarified correctly that the state law claims were premised solely on a trademark theory and that those claims "require[d] a likelihood of confusion." JA18; JA21-JA23. Because FAI had "not identified any alternate theory on which it bases its state law unfair competition claims, it would be error to allow the state claims to go to trial in light of the Court's decision" on likelihood of confusion. JA23. This was no abuse of discretion.

FAI asserts that clarification and reconsideration was inappropriate because Twic did not seek summary judgment on the state law claims. FAI Br. at 65-67. Twic's motion for summary judgment, however, explicitly requested that the Court "find[] that there is no likelihood of confusion between [Twic's] use of its mark and [FAI's] use of its mark, and dismiss[ FAI's] claims." JA496. This request was not limited to the federal claims; it sought summary judgment on all claims due to a lack of likelihood of confusion. JA496.

To the extent there was any question as to what claims were included in Twic's request for summary judgment on likelihood of confusion, Twic specifically identified the claims in its supporting memorandum: "trademark infringement, unfair competition, and false designation of origin under the Lanham Act, unfair competition under California state law, and common law unfair competition." JA1254. Twic also specifically explained that "likelihood of confusion is a required element in each of [FAI's] claims," making summary judgment in favor of Twic appropriate. JA1280. The assertion that Twic did not request summary judgment on all FAI's claims is explicitly contradicted by Twic's summary judgment filings. The district court did not improperly allow Twic to raise new arguments.

Nor did the court depart from the law of the case. Twic asked the court for summary judgment on likelihood of confusion (JA339), and the court found there is no likelihood of confusion. Twic did not ask the district court to reconsider whether there is likelihood of confusion; indeed, Twic *agreed* the court's decision on likelihood of confusion was correct. JA2645; JA2648-2650. Twic merely asked the Court to clarify how that ruling applied to the scope of the state law claims. JA2645; JA2648-2650. Twic was "not asking the Court to depart from the law of the case" and "[t]he Court need not identify or admit any error to clarify that the state claims, if proceeding on a trademark infringement theory alone, would require a likelihood of confusion." JA22-23. The court did not improperly depart from the law of the case but simply clarified that the finding of no likelihood of confusion meant that FAI could not proceed to trial on trademark claims under the guise of state law unfair competition claims. JA21. In sum, the district court honored its responsibility "to reach the correct judgment under law." JA22 (quoting *Am. Canoe Ass'n,* 326 F.3d at 515).

**B. The District Court Correctly Dismissed FAI's State Law Claims.**

From its complaint to its summary judgment papers, FAI was clear about one thing - that *all* of its claims were based on trademark infringement. In the first paragraph of its Amended Complaint, FAI unambiguously stated:

> This is an action for federal trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), federal trademark infringement, unfair competition and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for unfair and deceptive trade practices under the California Business & Professions Code Section 17200, and for common law unfair competition, all arising from the Defendant's unauthorized and infringing use of the FORMA mark in connection with Defendant's employee benefits software platform.

JA225 (emphasis added). In its summary judgment filings, FAI explicitly stated: "This trademark infringement case is about one thing: the likelihood of confusion Defendant Twic has caused by rebranding to 'Forma'…." JA349. Unsurprisingly, Twic understood that FAI's state law claims were premised on a trademark infringement theory. When FAI failed to identify any other theory for its state law claims, Twic asked the district court to clarify the scope of those claims. JA17.

If FAI's state law claims are premised only on a trademark infringement theory, then the court's finding there is no likelihood of confusion resolves those claims. "[A]n action based on [California]

Business and Professions Code section 17200 to redress an unlawful business practice 'borrows' violations of other laws and treats these violations, when committed pursuant to a business activity, as unlawful practices independently actionable . . . and subject to the distinct remedies provided thereunder." *Compound Dev. LLC v. Smith*, No. 23CFV01483, 2025 WL 818588, at *4 (Cal. Super. Ct. 2025). Unfair competition that sounds in trademark infringement is "based on the same elements required for a trademark claim under the Lanham Act." *AK Futures LLC v. TBH Supply LLC*, No. 8:23-cv-01030-JVS, 2023 U.S. Dist. LEXIS 198108, at *8 (C.D. Cal. Nov. 3, 2023); *see also Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) (Cal. Bus. & Prof. Code § 17200 claims based on trademark infringement are "substantially congruent" to trademark infringement under the Lanham Act); *accord Mintz v. Subaru of Am., Inc.*, 716 F. App'x 618, 622 (9th Cir. 2017); *Grupo Gigante S.A. de CV v. Dallo & Co.*, 391 F.3d 1088, 1100 (9th Cir. 2004). Therefore, likelihood of confusion is a required element to succeed when a party's California Business and Professional Code § 17200 claim is based on trademark infringement.

Similarly, when a North Carolina common law claim of unfair competition sounds in trademark infringement, it is analyzed under the

Lanham Act standard. *Passport Health,* 823 F. App'x at 153 (affirming summary judgment on unfair competition claims and N.C. Gen. Stat. 75-1.1 claims based on trademark infringement "because there's no likelihood of confusion as a matter of law"); *accord. Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 618 F.3d 441, 449 (4th Cir. 2010); *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987); *Johnson & Morris, PLLC v. Abdelbaky & Boes*, PLLC, No. 16 CVS 6151, 2017 NCBC LEXIS 89, at *5 (Supr. Ct. Wake. Cnty. Sep. 28, 2017). Accordingly, a claim for "Common Law Unfair Competition" under North Carolina law that sounds in trademark infringement requires a showing of likelihood of confusion.

FAI asserts the Ninth Circuit "suggested that, in the context of trademark infringement, a UCL claim may proceed even if there is no likelihood of confusion," citing to *Lodestar Anstalt v. Bacardi & Co.,* 31 F.4th 1228 (9th Cir. 2002). FAI Br. at 68-69. It did not. In *Lodestar,* the court actually found there was no likelihood of confusion, and that this resolved the claims under the Lanham Act and the portion of the § 17200 claim that was before it on appeal. 31 F.4th at 1261.

FAI also claims that *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1457 (9th Cir. 1991), supports

that the tests for a §17200 claim and a Lanham Act based on trademark infringement are "not identical." FAI Br. at 69. The case holds the opposite. In *Acad. of Motion Picture Arts*, the Ninth Circuit held that "[u]nder both [a § 17200 claim and a Lanham Act claim based on trademark infringement], the 'ultimate test' is 'whether the public is likely to be deceived or confused by the similarity of the marks.'" *Id.* (quoting *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988)). If anything, FAI's cases confirm that likelihood of confusion is required for § 17200 claims sounding in trademark infringement.

Turning to North Carolina, FAI asserts that *Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 167 (4th Cir. 2012), creates a cause of action where a defendant's use of a name that is not likely to confuse consumers nonetheless "deceived" a *de minimis* number of consumers. FAI Br. at 69-70. The language cited by FAI, however, merely notes that intentional trade dress infringement falls within the broad "category of conduct that North Carolina courts have held possesses the tendency or capacity to mislead or creates the likelihood of deception." (*Id.*) In other words, the *Belk* court recognized that many different bad acts can give rise to an unfair competition claim, and that trade dress infringement is one such act. The

*Belk* ruling does not alter this Circuit's rule that the test for trademark infringement under the Lanham Act is the test that applies to a North Carolina unfair competition claim that sounds in trademark infringement. *See Passport Health*, 823 F. App'x at 153.[5]

**III. Conclusion**

For the foregoing reasons, the Court should affirm the district court's final judgment.

## STATEMENT REGARDING ORAL ARGUMENT

Because the issues raised on this appeal are governed by well-established Circuit precedent, Twic does not believe oral argument is necessary in this case.

[5] The other North Carolina case relied upon by FAI for this proposition, *Gilbane Building. Co. v. Federal Reserve Bankof Richmond*, 80 F.3d 895, 902 (4th Cir. 1996), was a contract dispute about payments and representations regarding the same. It had nothing to do with trademarks or business names. *Id*.

Dated: September 8, 2026

RESPECTFULLY
SUBMITTED BY:
Emily M. Haas
Michael Best & Friedrich LLP
4509 Creedmoor Rd, Ste 501
Raleigh, NC 27612
(984) 220-8745
emhaas@michaelbest.com

## CERTIFICATE OF SERVICE

I certify that on September 8, 2026, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

RESPECTFULLY
SUBMITTED BY:
Emily M. Haas
Michael Best & Friedrich LLP
4509 Creedmoor Rd, Ste 501
Raleigh, NC 27612
(984) 220-8745
emhaas@michaelbest.com

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**No.** 26-1603 **Caption:** Forma AI, Inc. v. Twic, Inc.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains 12,604 [*state number of*] words

☐ this brief uses monospaced type and contains ____________ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☐ this brief or other document has been prepared in a proportionally spaced typeface using ____________________________ [*identify word processing program*] in ____________________________ [*identify font, size, and type style*];

**or**

☐ this brief or other document has been prepared in a monospaced typeface using ____________________________ [*identify word processing program*] in ____________________________ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) Emily Haas

Party Name Twic, Inc. Date: Sept. 8, 2026